# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

No. ACM 38958

————————————

## UNITED STATES
*Appellee*

v.

## Michael SILVA
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 19 July 2017

————————————

*Military Judge:* Wendy L. Sherman (arraignment); Natalie D. Richardson (trial).

*Approved sentence:* Dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 30 January 2015 by GCM convened at Joint Base San Antonio–Lackland, Texas.

*For Appellant:* Captain Patricia Encarnación Miranda, USAF; Peter Kageleiry, Jr., Esquire.

*For Appellee:* Major Tyler B. Musselman, USAF; Major Mary Ellen Payne, USAF; Gerald R. Bruce, Esquire.

Before DREW, JOHNSON, and SPERANZA, *Appellate Military Judges.*

Senior Judge JOHNSON delivered the opinion of the court, in which Chief Judge DREW and Judge SPERANZA joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

JOHNSON, Senior Judge:

A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of three specifications of rape in violation of Article 120 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] The court-martial sentenced Appellant to a dishonorable discharge, confinement for 20 years, total forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

On appeal, Appellant raises seven assignments of error: (1) in light of *United States v. Hills,* 75 M.J. 350 (C.A.A.F. 2016), the military judge committed prejudicial error in her instructions to the court members; (2) the military judge abused her discretion by overruling Defense objections to evidence the Government offered pursuant to Military Rule of Evidence (Mil. R. Evid.) 404(b); (3) the military judge's failure to disclose mental health records of one of the victims denied Appellant his Sixth Amendment[2] right to confrontation; (4) the evidence is factually insufficient to sustain the convictions; (5) the Government violated Appellant's rights to discovery; (6) Appellant did not receive effective assistance from his trial defense counsel; and (7) the military judge abused her discretion by failing to dismiss the charge and specifications for unlawful command influence.[3] In addition, although not raised by Appellant, we note the post-trial processing of his case was subjected to a facially unreasonable delay.[4] However, because our superior court's holding in *Hills* compels us to set aside the convictions and sentence, we do not address the remaining issues.

---

[1] Appellant was acquitted of one specification of rape in violation of Article 120, UCMJ.

[2] U.S. CONST. amend. VI.

[3] Assignments of error (4), (5), (6), and (7) are raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

[4] Appellant was sentenced on 30 January 2015; the convening authority took action on 24 November 2015; and Appellant's record of trial was docketed with this court on 19 January 2016. Thus, both the 120-day sentencing-to-action threshold and the 30-day action-to-docketing threshold for facially unreasonable post-trial delay established in *United States v. Moreno,* 63 M.J. 129, 142 (C.A.A.F. 2006), were exceeded. However, in light of our disposition of the case in accordance with *United States v. Hills,* 75 M.J. at 355–58, we need not address whether these delays amounted to a violation of Appellant's due process right to timely post-trial review, nor whether relief for post-trial delay is otherwise appropriate. *See Moreno,* 63 M.J. at 143; *United States v. Gay,* 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd,* 75 M.J. 264 (C.A.A.F. 2016); *United States v. Tardif,* 57 M.J. 219, 225 (C.A.A.F. 2002).

## I. BACKGROUND

### A. Specification 1

Appellant married BS in September 1990 in Texas. Appellant joined the Air Force shortly thereafter in order to support BS and their son, MS, who was born in January 1991. While Appellant attended training, BS initially lived with her mother in Texas and then with Appellant's mother and sister in Georgia. Later, BS and MS joined Appellant in North Carolina, where he was stationed at Pope Air Force Base (AFB). Eventually, Appellant obtained a divorce and he was awarded primary custody of MS. At some point thereafter, BS—in her own words—"kidnapped" MS and took him to Puerto Rico where her grandmother lived. However, BS soon returned to North Carolina and brought MS back to Appellant. She moved back in with Appellant, although they remained divorced. Ultimately, in late 1993 BS moved back to Texas, lost all contact with Appellant and their son, and remarried. She was interviewed by agents of the Air Force Office of Special Investigations (AFOSI) in February 2013 after she was identified during AFOSI's investigation of Appellant.

At trial, BS testified she and Appellant engaged in both consensual and non-consensual sexual intercourse during and after their marriage. She testified that on the non-consensual occasions she would tell him "no," but she did not physically resist. BS further testified that at one point she reported this sexual abuse to an unnamed doctor, but the doctor told her North Carolina law at the time did not recognize spousal rape.[5] BS testified Appellant would tell her the same thing. In addition, BS testified that on multiple occasions Appellant put her in the closet of their apartment and would not let her leave for a period of time; that he slapped her head with his open hand; that he was controlling and verbally abused her; and that he inserted his fingers in her vagina—purportedly to detect whether she had been having sex with someone else while he was at work. BS further testified that he choked her, pinning her against the wall by holding his hand against her neck. There were no other eyewitnesses to any of these events.

At trial, Appellant was charged with raping BS on divers occasions between 23 October 1992 and on or about 31 December 1993.[6]

---

[5] At trial, the military judge took judicial notice that under North Carolina law in 1992 and until 5 July 1993, it was a complete defense to the crime of rape and other sexual offenses that the victim was the legal spouse of the defendant at the time of the offense, unless they were living separate and apart.

[6] Appellant and BS were divorced throughout the charged period.

**B. Specifications 2 and 3**

In 20 September 1995, SCG began Air Force basic military training (BMT) at Lackland AFB, Texas. Appellant, a Senior Airman at the time, was the primary training instructor assigned to SCG's flight. SCG testified that one night, "a few days" after she arrived, Appellant woke her in her bed and told her to put on her physical training uniform. He then led her out of the dorm and some distance away from the building to his car. After they got inside, Appellant began talking about himself and playing with SCG's hair. Appellant then told SCG to come around to his side of the car and instructed her to perform oral sex on him. When SCG resisted, Appellant pushed her head down. Appellant then placed her inside the car lying on her back, pulled her clothing down, and raped her. After Appellant ejaculated, he used a wipe to clean himself and to clean SCG both externally and internally. Appellant told SCG that if she reported the incident, no-one would believe her and it would ruin her career. SCG then followed Appellant back to the dorm and returned to her bed. She did not initially report the incident to anyone.

SCG testified that a few days after this incident, Appellant came to the dorm and told her she needed to put her battle dress uniform on because she would be performing duty at a desk that night. Accordingly, after lights out, SCG exited the dorm in her uniform and found Appellant waiting for her in his car. Appellant told her to get in the car and to put her head down, so that she could not see where they were going. Appellant then showed SCG her driver's license and made a comment that she interpreted as a threat to kill her if she did not do as he said. Appellant then drove for what SCG estimated to be less than 20 minutes. When they stopped, Appellant took her out of the car and continued to keep her head down so she could not see where they were going. After a few steps they entered a building that was very dark inside. Appellant began removing SCG's clothing and pushed her down onto a sheet on the floor. After spraying something on her neck and shoulders and playing with her hair, Appellant raped her. As he was doing so, he put his hand on her throat and pushed so that she could not breathe. He asked her if she enjoyed that; she said "no." Appellant then withdrew and digitally penetrated SCG until she had an orgasm. He then reinserted himself and ejaculated. Afterwards, Appellant sat beside her talking for a while before he turned her over and penetrated her anus with his penis. Appellant then wiped her clean internally and externally again, dressed her, and returned her to the dorm, again having her keep her head down so she could not see where they were going. The dorm guard let SCG into the building, and she returned to her bed. Again, she did not initially report the incident.

SCG testified that more than one day after the second incident, Appellant noticed something wrong in the way she was running. Appellant sent her to

have a medical exam, which resulted in SCG being placed on medical hold and ultimately moved out of Appellant's flight and into another flight. During her time with this new flight, SCG experienced two episodes where she passed out and fell down. SCG was transferred to a squadron for trainees on medical hold and was ultimately medically discharged in late 1995 without completing BMT. SCG testified that before she was discharged, she told a doctor that she was sexually assaulted by an instructor. According to SCG, the doctor responded by telling her they were not going to discuss it, that the doctor would not put his "career on the line" by reporting the matter, and that the doctor gave her an unsupported diagnosis regarding migraine headaches which resulted in her medical discharge.

SCG testified that while she was awaiting her medical discharge she told another female Airman about the rape, but told the Airman not to tell anyone else. When SCG returned to her home of record, she told her mother about the rape, but also made her mother promise not to tell anyone else. In the years that followed, SCG married, divorced, remarried, and had several children. In 2009 SCG's second husband noticed she was having nightmares that seemed related to her time in the Air Force. He pressed her to tell him what it was about, and she gradually disclosed to him what Appellant had done to her. With his encouragement, SCG sought assistance through the Veterans Administration. Finally, in 2012 SCG contacted AFOSI and reported the first rape, which initiated the investigation that resulted in Appellant's court-martial.

At trial, Appellant was charged with one specification of raping SCG "in a vehicle" between on or about 1 September 1995 and on or about 31 December 1995, and one specification of raping her "in a dwelling" between on or about 1 September 1995 and on or about 31 December 1995.

## C. Specification 4

In the spring of 2006, Appellant, then a Technical Sergeant, and JB, then an active duty Senior Airman, were both assigned to Francis E. Warren AFB, Wyoming. They married after dating for just two weeks. As JB described it, the marriage was not a happy one. Appellant was secretive, dominating, and jealous. He did not want JB to be involved in raising his teenage son MS, and he discouraged her from maintaining contact with her family. Nevertheless, Appellant and JB engaged in consensual sex during the marriage. At trial, JB described how on one such occasion Appellant choked her with his hands until she tapped him, causing him to stop.

They separated in February 2007, when JB moved into the base dorm. Appellant initiated a divorce. However, JB would still meet Appellant for dinner and spend time at Appellant's house watching television with Appellant and

his son. JB and Appellant also continued to engage in consensual sex, approximately 10 times between February and April 2007. JB testified she still loved Appellant and hoped their marriage could be saved. However, JB testified that on 28 April 2007 as she was preparing to leave Appellant's house one evening after watching a movie, as MS slept on the living room sofa, Appellant unexpectedly guided her to the bedroom. Appellant pushed her down on the bed and raped her. JB told him to stop and tried to "squirm" away, but she did not "fight" him and did not call out to MS for help. Afterwards, JB dressed herself, returned to her dorm, and cried in the shower for two hours.

In the days that followed, JB reported what happened to her mother, brother, sister, and a co-worker. Five days after the assault, she received papers related to the divorce, and she went to her acting first sergeant for assistance in dealing with the divorce. During the meeting she disclosed the rape, which led to JB meeting with AFOSI, which initiated an investigation. However, JB subsequently wrote a contradictory statement for AFOSI stating that she did not believe Appellant had raped her. This statement contributed to the investigation being dropped. At trial, JB explained this statement by testifying that she allowed herself to "get confused on what rape really was," that she was "scared" and she "couldn't handle it" at that time. Eventually, JB was medically retired from the Air Force. However, her prior report was identified during the AFOSI investigation initiated by SCG's report. JB was reinterviewed by AFOSI in January 2013, and her allegations became part of Appellant's court-martial.

At trial, Appellant was charged with one specification of raping JB between on or about 1 February 2007 and on or about 30 April 2007.

## D. Chief Master Sergeant KM

Chief Master Sergeant (CMSgt) KM first met Appellant when she attended BMT in 1995. She encountered him again when she returned to Lackland AFB as an instructor in 1999. CMSgt KM was a Senior Airman at the time and Appellant was still an instructor. CMSgt KM and Appellant were acquaintances, but had no dating or sexual relationship.

Sometime in the late summer of 2002, CMSgt KM invited Appellant to her apartment. Appellant brought his guitar. The two of them sat on her couch talking for a period of time, and then Appellant played several songs on his guitar. CMSgt KM initiated a kiss with Appellant, but something about it made her feel uncomfortable. CMSgt KM asked Appellant to leave. He agreed, and they moved toward the door. CMSgt KM testified that the next thing she could remember was lying on her back in the entrance to her apartment and Appellant choking her with his hand around her neck. Appellant was simultaneously using his other hand and mouth to perform oral sex on her. She had

difficulty breathing and was pushing with her feet to get away. She could recall few details other than that he stopped at some point, said something to her, and departed. CMSgt KM did not initially report the incident; however, she did disclose the incident when she was contacted in 2013 in the course of the AFOSI investigation.

At trial, Appellant was not charged with any offenses in relation to CMSgt KM; however, the Government called her to testify pursuant to Mil. R. Evid. 413.

### E. Trial

After arraignment but before trial, the Government notified the Defense of evidence of "similar crimes" by Appellant it might introduce pursuant to Mil. R. Evid. 413, including the charged offenses themselves, as well as uncharged sexual misconduct with BS, SCG, JB, and CMSgt KM. In response, the Defense moved to "exclude the proffered [Mil. R. Evid.] 413 evidence from this court-martial." The Government opposed the motion. The military judge held a hearing on the motion. After making the required threshold findings for Mil. R. Evid. 413 and applying the Mil. R. Evid. 403 balancing test informed by the factors articulated in *United States v. Wright*, 53 M.J. 476, 482 (C.A.A.F. 2000), the military judge denied the Defense's motion and allowed the evidence.

At trial, BS, SCG, JB, and CMSgt KM testified as indicated above. In addition, the Government offered the testimony of BS's husband, SCG's husband and mother, and JB's acting first sergeant and commander at the time of her initial report to support various aspects of the victims' testimony, in particular their earlier reports of the charged offenses. The Government also called a retired Master Sergeant and current civilian Air Force employee at BMT, who was also a training instructor with Appellant in 1995, to testify regarding the procedures and facilities at BMT in 1995 in an effort to lend plausibility to SCG's testimony. Furthermore, the Government called two other women, both Air Force noncommissioned officers, who testified that in the course of their consensual sexual relationships with Appellant he engaged in abrupt digital penetration (with respect to one) and choking (with respect to both). The Government called the AFOSI special agent in charge of the investigation to explain aspects of the investigation, and in particular to combat the suggestion that AFOSI interviewing techniques would have colored witness testimony or informed the victims of details provided by other witnesses. Finally, the Government called Appellant's sister to testify to the type of vehicle he drove in 1995 to further support SCG's account.

The military judge provided, *inter alia*, the following instructions to the court members before counsels' arguments on findings:

An accused may be convicted based only on evidence before the court, not on evidence of a general criminal predisposition. Each offense must stand on its own, and you must keep the evidence of each offense separate. Stated differently: if you find or believe that the accused is guilty of one offense, that—you may not use that finding, or that belief as a basis for inferring, assuming, or proving that he committed any other offense. . . . Proof of one offense carries with it no inference that the accused is guilty of any other offense.

. . . .

*Evidence that the accused committed one sexual offense alleged in a Specification—so 1, 2, 3, or 4 of the Charge—may have no bearing on your deliberations in relation to any other of those Specifications unless you first determine by preponderance of the evidence, that is more likely than not, that one offense alleged occurred. So if you determine by preponderance of the evidence that the offense alleged in the specification of the Charge occurred, even if you are not convinced beyond a reasonable doubt that the accused is guilty of that offense, you may nonetheless then consider the evidence of that offense for its bearing on any matter to which it is relevant in relation to the other alleged specifications. You may also consider the evidence of such other sexual offenses for its tendency, if any, to show the accused [sic] propensity or predisposition to engage in sexual offenses.* You may not, however, convict the accused solely because you believe he committed this other offense or solely because you believe the accused has a propensity or predisposition to engage in sexual offenses. In other words you cannot use this evidence to overcome a failure of proof in the government's case if you perceive any to exist. The accused may be convicted of an alleged offense only if the prosecution has proven each element beyond a reasonable doubt. Each offense must stand on its own, and the proof of one offense carries no inference that the accused is guilty of any other offense. In other words, proof of one sexual offense creates no inference that the accused is guilty of any other sexual offense. However, it may demonstrate that the accused has a propensity to commit that type of offense. The prosecution's burden of proof to establish the accused [sic] guilt beyond a reasonable doubt remains as to each and every element of each offense charged. Proof of one, proof of one charged offense carries with it no inference that the accused is guilty of any other charged offense.

(Emphasis added.)

The court-martial acquitted Appellant of Specification 1, alleging the rape of BS in 1992 and 1993, and convicted him of Specifications 2, 3, and 4, alleging the two rapes of SCG in 1995 and the rape of JB in 2007.

## II. DISCUSSION

### A. Law

A military judge's decision to admit evidence is reviewed for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013). The meaning and scope of Mil. R. Evid. 413 is a question of law that is reviewed de novo. *Hills*, 75 M.J. at 354 (citation omitted). Instructional errors are also reviewed de novo. *Id.* at 357 (citation omitted).

Mil. R. Evid. 413(a) provides that in a court-martial where the accused is charged with a sexual offense, evidence that the accused committed other sexual assaults may be admitted and considered on "any matter to which it is relevant." This includes using evidence of sexual assaults to prove the accused has a propensity to commit sexual assault. *United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006). In *United States v. Wright*, the Court of Appeals for the Armed Forces (CAAF) required military judges to make the following three threshold findings before admitting evidence under Mil. R. Evid. 413: (1) the accused is charged with an offense of sexual assault; (2) the evidence proffered is evidence of his commission of another offense of sexual assault; and (3) the evidence is relevant under Mil. R. Evid. 401 and Mil. R. Evid. 402. *Wright*, 53 M.J. at 482. If the proffered evidence meets the threshold findings required by *Wright*, the military judge must still apply the balancing test of Mil. R. Evid. 403. *Id.* The evidence "may be excluded if its 'probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members.'" *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) (quoting Mil. R. Evid. 403).

However, in *Hills*, the CAAF held that evidence of the accused's commission of a sexual assault may *not* be used in this way if the alleged sexual assault is charged in the same court-martial and the accused has pleaded not guilty to it. 75 M.J. at 356. The CAAF further held that the instructions accompanying the admission of evidence of charged offenses for Mil. R. Evid. 413 purposes implicate fundamental constitutional due process concerns by undermining an accused's presumption of innocence and the Government's requirement to prove guilt beyond a reasonable doubt. *Id.* at 357. Because "constitutional dimensions are in play," prejudice for such an error must be tested for harmlessness beyond a reasonable doubt. *Id.* In other words, the Government must

demonstrate there is no reasonable possibility that the error contributed to the conviction. *Id.*

In *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017), the CAAF clarified that *Hills* is not to be interpreted narrowly:

> [T]he use of evidence of charged conduct as M.R.E. 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected. Whether considered by members or a military judge, evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense.

*Id.* at 222. The court reiterated that, where such error exists, the Government must "prove there was no reasonable possibility that the error contributed to [the] verdict." *Id.*

### B. Analysis

The Government concedes that, in light of *Hills* and *Hukill*, the military judge erred in permitting evidence of the charged sexual offenses to be used pursuant to Mil. R. Evid. 413 and instructing the court members accordingly. We agree. Although the military judge's ruling is understandable, coming as it did before the decision in *Hills*, we must "apply the clear law at the time of appeal, not the time of trial." *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (citing *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008)).

Nevertheless, the Government contends the error in Appellant's case is harmless beyond a reasonable doubt. We cannot agree. The Government argues a combination of four "factors" support its position; we consider each in turn.

First, the Government argues the fact that the court members acquitted Appellant of raping BS indicates that the panel did not improperly use the charged offenses to conclude Appellant had a propensity to commit sexual assault. According to the Government, the findings indicate a discerning panel that was minimally impacted by the military judge's Mil. R. Evid. 413 instruction and held the Government to its burden. If the members had found a propensity to commit sexual assault, the Government posits, they would have convicted Appellant of all specifications.

We perceive several flaws in this argument. Most fundamentally, this is sheer speculation regarding the panel's thought process. It is also possible the members found BS's testimony to be so questionable that they acquitted Appellant with regard to her allegations *despite* a conclusion that Appellant has

10

a general propensity to commit sexual assault. Moreover, one could argue that the acquittal demonstrates the weakness of the Prosecution's case and that, but for the propensity instruction, Appellant might have been acquitted of all specifications. We do not suggest that this is the case; rather, the point is that it is impossible to safely deduce the members' exact reasoning from the result.

Second, the Government notes the military judge properly admitted CMSgt KM's testimony regarding an uncharged sexual assault as Mil. R. Evid. 413 propensity evidence. In effect, the Government appears to be contending—in stark juxtaposition with its first argument that the members did not find a propensity—that the proper, uncharged Mil. R. Evid. 413 evidence was so compelling that the members would have found a propensity to commit sexual assault that corroborated SCG's and JB's testimony regardless of the military judge's error. Again, we are unconvinced. The members were instructed they could use the testimony of BS, SCG, and JB, as well as CMSgt KM, to potentially find Appellant had a propensity to commit sexual assault. We cannot reliably subtract the impact of the three charged offenses from CMSgt KM's testimony in that analysis. The Government's reliance on contradictory arguments underscores just how little we can discern of the impact the erroneous instructions had on the members.

Third, the Government minimizes the extent to which senior trial counsel's argument relied on propensity evidence with respect to the charged offenses. The Government also notes trial defense counsel's argument highlighted the military judge's instruction that each specification must stand on its own and be proven beyond a reasonable doubt. These points do little to allay our concerns. Doubtless, the Government's case on appeal would be even more difficult if senior trial counsel had in argument hammered on the importance of the evidence of the charged offenses in establishing Appellant's propensity to commit sexual assault. It is not surprising that he focused on CMSgt KM's testimony with respect to propensity; unlike the evidence of the charged offenses, her testimony had no other purpose. Yet, counsels' arguments are merely arguments; they do not carry the weight of either the evidence or the military judge's instructions. Senior trial counsel did not advise the court members to disregard evidence of the charged offenses for propensity purposes; even if he had, such argument from counsel would be unlikely to counterbalance the military judge's erroneous instruction.

One of the essential strengths of the Government's case, and one which senior trial counsel did return to repeatedly in his argument, was the fact that multiple women with no connection to each other—other than being victimized by Appellant—had independently accused him of sexual assault. The military judge's erroneous instruction played directly into this strength by permitting the members, essentially, to find by a preponderance of evidence from the

charged and uncharged offenses that Appellant had a predisposition to commit sexual assault, and to use that finding to support a conclusion that Appellant was guilty.

Finally, the Government argues the evidence of Appellant's guilt with regard to SCG and JB was "overwhelming." Again, we disagree. There were weaknesses in the Government's case. The alleged crimes occurred far in the past. There were no eyewitnesses other than the victims themselves. The only one of the charged or uncharged victims to report the alleged crimes to law enforcement prior to 2012 was JB, and she recanted her initial allegation. The Prosecution presented no physical, scientific, or photographic evidence of any of the offenses.[7] The Government offered no confessions or admissions to any of the offenses by Appellant, who did not testify. Specifically with regard to SCG, the Defense introduced medical records, called witnesses, and elicited direct and cross-examination testimony that suggested the window of opportunity for Appellant to have committed the two rapes was a narrow one, and tended to cast doubt on her account in other ways. With regard to JB, in addition to her recantation of her initial allegation in 2007, the Defense contended her status as an ex-spouse through a divorce initiated by Appellant was a clear bias. Further, the Defense highlighted that both SCG and JB received substantial monthly disability payments from the Government based, at least in part, on mental health disorders related to the alleged sexual assaults by Appellant, although both victims averred their understanding that such payments were not tied to their cooperation in Appellant's prosecution.

For the reasons stated above, we cannot be confident there is "no reasonable possibility" that the erroneous instructions "contributed to [the] verdict" in this fiercely contested trial. *Hukill*, 76 M.J. at 222. Thus, we cannot sustain Appellant's convictions.

---

[7] The Government did introduce photographs of the victims as they appeared close in time to the alleged offenses, as well as a number of photographs of the BMT dorm SCG was assigned to and its environs.

## III. CONCLUSION

The findings of guilt and the sentence are **SET ASIDE**. A rehearing is authorized. Article 66(c), UCMJ, 10 U.S.C. § 866.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court